**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mary Villescaz, guardian of Francisco Javier Villescaz,<br><br>    Plaintiff,<br><br>vs.<br><br>City of Eloy, Pinal County, et al.,<br><br>    Defendants. | No. CV-06-2686-PHX-FJM<br><br>**ORDER** |

The court has before it Pinal County, Roger Vanderpool, and Christopher L. Vasquez's ("Pinal County Defendants") motion to dismiss (doc. 35), plaintiff's response (doc. 37), and Pinal County Defendants' reply (doc. 41).

Between June 19, 2003, and April 20, 2004, while awaiting trial on charges of first degree murder and armed robbery, plaintiff was detained in the Pinal County Jail.[1] He alleges that during his detention he was deprived of his rights under the Equal Protection Clause, the Due Process Clause, and the Americans with Disabilities Act, 42 U.S.C. § 12132. He claims that Pinal County failed to train its personnel to adequately care for persons with

---

[1] Plaintiff is mentally retarded and claims to suffer from a seizure disorder. On April 20, 2004, he was found incompetent to stand trial and unrestorable, and on July 19, 2004, a guardian was appointed.

1  disabilities and failed to provide adequate medical care, including medication. The Pinal
2  County Defendants move to dismiss the complaint because plaintiff failed to exhaust
3  available administrative remedies as required by the Prison Litigation Reform Act of 1995
4  ("PLRA"), 42 U.S.C. § 1997e(a). Plaintiff does not contend that he exhausted available
5  administrative remedies, nor that his mental incompetency precluded him from doing so.
6  Instead, he argues that his claims are not subject to the PLRA because he was not a
7  "prisoner" at the time his complaint was filed.

8        The Pinal County Jail had a four-tiered grievance system in place during plaintiff's
9  detention, through which inmates and detainees could assert complaints regarding conditions
10 of confinement (doc. 35, ex. 3 at 5-6). Under the jail's grievance system, inmates were first
11 required to verbally present any complaint to a housing officer. If the complaint was not
12 informally resolved, an inmate was required to submit a written grievance to the housing
13 officer within 48 hours of the incident. Any grievance left unresolved at this stage could then
14 be appealed to the jail's hearing officer within 24 hours of the original decision. The hearing
15 officer's decision could be appealed to the detention administrator. Although plaintiff
16 regularly communicated his needs and concerns to jail staff (doc. 35, ex. 2 ¶¶ 30-35), he did
17 not file any written grievances during his 10-month detention.

18       The PLRA provides that "[n]o action shall be brought with respect to prison
19 conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any
20 jail, prison, or other correctional facility until such administrative remedies as are available
21 are exhausted." 42 U.S.C. § 1997e(a). The PLRA defines "prisoner" as "any person
22 incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or
23 adjudicated delinquent for, violations of criminal law or the terms and conditions of parole,
24 probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). Although once
25 within the discretion of the district court, "exhaustion is now required for all actions brought
26 with respect to prison conditions." Porter v. Nussle, 534 U.S. 516, 524, 122 S. Ct. 983, 988
27 (2002) (quotations and alterations omitted). Even when a prisoner seeks relief not available
28

1 in grievance proceedings, such as monetary damages, exhaustion remains a prerequisite to
2 suit. Booth v. Churner, 532 U.S. 731, 741, 121 S. Ct. 1819, 1825 (2001).

3       The question whether the PLRA exhaustion requirement applies to a former prisoner
4 is an issue of first impression in this circuit. Although plaintiff relies on Page v. Torrey, 201
5 F.3d 1136 (9th Cir. 1999), as support for the proposition that the PLRA applies only to
6 currently incarcerated prisoners, the issue presented in Page is distinguishable from that
7 presently before us. Page considered whether a person who is civilly committed to a state
8 hospital is a "prisoner" within the meaning of the PLRA. The court held that to fall within
9 the definition of "prisoner," the "individual in question must be currently detained as a result
10 of accusation, conviction, or sentence for a criminal offense." Id. at 1139. The court's focus
11 was on the reason for the detention. It concluded that the exhaustion requirement does not
12 apply to a person civilly committed for non-punitive purposes. Id. at 1140. Its reference to
13 "currently detained" was not necessary to its holding (because the person was currently
14 detained), and therefore Page does not resolve the question now before us.

15       Those circuits that have squarely considered the issue have concluded that the PLRA
16 does not apply to lawsuits filed by former prisoners. See, e.g., Greig v. Goord, 169 F.3d
17 165, 167 (2d Cir. 1999); Ahmed v. Dragovich, 297 F.3d 201, 210 (3d Cir. 2002); Cox v.
18 Mayer, 332 F.3d 422, 424-25 (6th Cir. 2003); Kerr v. Puckett, 138 F.3d 321, 323 (7th Cir.
19 1998); Nerness v. Johnson, 401 F.3d 874, 876 (8th Cir. 2005); Norton v. City of Marietta,
20 432 F.3d 1145, 1150 (10th Cir. 2005); Harris v. Garner, 216 F.3d 970, 979-80 (11th Cir.
21 2000). These courts have interpreted the phrase "no action shall be brought . . . by a prisoner
22 confined in" any jail or other correctional facility to mean that the prisoner must be *currently*
23 confined at the time the complaint is filed. Relying on what they considered to be the "plain
24 and ordinary meaning of the words," Harris, 216 F.3d at 974, these courts reasoned that it is
25 the confinement status at the time the lawsuit is brought that controls whether exhaustion is
26 required. While we are respectful of the weight of authority elsewhere, we think that reliance
27 on this construction of § 1997e is inconsistent with Congress's clearly expressed intention
28

- 3 -

1 and produces the anomalous result of permitting certain short-term prisoners to simply
2 ignore, at their option, the entire scheme of administrative remedies.

3 Under this construction of the statute, the applicability of the PLRA is effectively
4 determined by a prisoner's length of incarceration and the relevant statute of limitations. For
5 example, in Arizona, the statute of limitations for claims brought under 42 U.S.C. § 1983 is
6 two years. See TwoRivers v. Lewis, 174 F.3d 987, 992 (9th Cir. 1999). An Arizona inmate
7 whose initial or remaining term is less than two years can simply choose to ignore the
8 exhaustion requirement and wait to file his lawsuit upon release from prison. The majority
9 of pretrial detainees, such as plaintiff, as well as countless other short-time prisoners, would
10 fall within this exception. It is unlikely that Congress intended that an entire class of
11 prisoners should be exempt from the PLRA exhaustion requirements.

12 In our view, Congress has neither expressly required nor excused exhaustion of
13 administrative remedies by former prisoners. That the statute expressly requires exhaustion
14 for current prisoners does not mean that former prisoners are not required to exhaust under
15 general principles of exhaustion. The most that we can conclude from the language of §
16 1997e is that "Congress has not meaningfully addressed the appropriateness of requiring
17 exhaustion in this context." See McCarthy v. Madigan, 503 U.S. 140, 149, 112 S. Ct. 1081,
18 1088 (1992). "Where Congress specifically mandates, exhaustion is required." Id. at 144,
19 112 S. Ct. at 1086. However, "courts play an important role in determining the limits of an
20 exhaustion requirement and may impose such a requirement even where Congress has not
21 expressly so provided." Patsy v. Bd. of Regents, 457 U.S. 496, 501, 102 S. Ct. 2557, 2560
22 (1982). "[W]here the statutory requirement of exhaustion is not explicit, courts are guided
23 by congressional intent in determining whether application of the doctrine would be
24 consistent with the statutory scheme." Id. at 502 n.4, 102 S. Ct. at 2560 n.4. Therefore,
25 consistent with the Supreme Court's recent analysis in Woodford v. Ngo, 548 U.S. 81, 126
26 S. Ct. 2378 (2006), in construing the boundaries of § 1997e(a), we turn to traditional
27 principles of administrative exhaustion for guidance. Id. at 2392 (stating that the "PLRA
28 uses the term 'exhausted' to mean what the term means in administrative law").

- 4 -

1    Under traditional principles of administrative law, where relief is available from an
2    administrative agency, "no one is entitled to judicial relief for a supposed or threatened injury
3    until the prescribed administrative remedy has been exhausted." Id.; see also Myers v.
4    Bethlehem Shipbuilding Corp, 303 U.S. 41, 50-51, 58 S. Ct. 459, 464 (1938). The policies
5    underlying the administrative exhaustion requirement are twofold—exhaustion protects an
6    administrative agency's autonomy by minimizing unnecessary judicial intervention, and it
7    "promotes judicial efficiency" by allowing the agency the opportunity to correct its own
8    errors and to create a record in order to facilitate judicial review. McCarthy, 503 U.S. at 145,
9    112 S. Ct. at 1086; Terrell v. Brewer, 935 F.2d 1015, 1019 (9th Cir. 1991). Recognizing that
10   exhaustion requirements are designed to induce those who are otherwise unwilling to
11   exhaust, administrative law incorporates a mechanism to enforce compliance, the sanction
12   of dismissal for failure to properly exhaust. See Woodford, 126 S. Ct. at 2385.

13   The policies underlying administrative exhaustion in general directly comport with
14   the policies supporting the PLRA exhaustion requirement. Congress enacted the PLRA in
15   response to a flood of prisoner litigation in federal courts. 141 Cong. Rec. H14078-02,
16   H14105 (daily ed. Dec. 6, 1995). It sought to filter out frivolous claims and facilitate an
17   administrative record through an internal grievance process, thereby "reduc[ing] the quantity
18   and improv[ing] the quality of prisoner suits." Porter, 534 U.S. at 524, 122 S. Ct. at 988.
19   The PLRA attempts to promote prison autonomy by eliminating unnecessary interference of
20   the administration of prisons by the federal courts. Woodford, 126 S. Ct. at 2387-88
21   (recognizing a state's significant interest in administration of its prisons). Accordingly, the
22   PLRA "afford[s] corrections officials time and opportunity to address complaints internally
23   before allowing the initiation of a federal case," thereby providing prisons an opportunity to
24   correct their own errors. Id. at 2387 (quoting Porter, 534 U.S. at 525, 122 S. Ct. at 988).
25   Under plaintiff's theory, rather than promoting prison autonomy, short-term prisoners would
26   decide if prisons would first hear their complaints.

27   In addition to promoting prison autonomy, Congress sought to reduce the quantity and
28   improve the quality of prisoner actions. Providing prisons the opportunity to take corrective

1 action in the first instance could improve prison administration, as well as satisfy the inmate, 2 thereby obviating the need for litigation altogether. Porter, 534 U.S. at 525, 122 S. Ct. at 3 988. In the event an action is ultimately filed, the creation of an administrative record that 4 "clarifies the contours of the controversy" could significantly facilitate the litigation. Id. 5 Each of these legislative goals is lost with respect to short-term prisoners when prisons have 6 no effective opportunity to evaluate the complaints first.

7 The circuits that have held that the PLRA is not applicable to former prisoners rely 8 on discrete portions of legislative history that recognize that a policy behind the PLRA is to 9 deter litigation by idle prisoners. "Filing frivolous civil rights lawsuits had become a 10 recreational activity for long-term residents of our prisons," who "have little to lose and 11 everything to gain," including "a short sabbatical in the nearest Federal courthouse." 141 12 Cong. Rec. S7498-01, S7524-26 (daily ed. May 25, 1995) (statements of Sens. Dole and 13 Kyl); Kerr, 138 F.3d at 323 ("Congress deemed prisoners to be pestiferous litigants because 14 they have so much free time on their hands and there are few costs to filing suit."). The 15 courts reasoned that these concerns are largely inapplicable to persons who are no longer 16 incarcerated. See Greig, 169 F.3d at 167; Kerr, 138 F.3d at 323 ("Opportunity costs of 17 litigation rise following release, diminishing the need for special precautions against weak 18 suits."). While these are important legislative considerations, they are not the only ones. 19 Congress's broader goals in requiring exhaustion are to reduce the overall number of 20 frivolous prisoner lawsuits, provide the prisons an opportunity to consider first and possibly 21 resolve the complaint, and to develop an administrative record in the event an action is filed. 22 These policies are applicable to any prison complaint, whether asserted by long-term or 23 short-term prisoners.

24 In sum, we do not adopt an interpretation of the PLRA that would permit "[a] 25 prisoner's deliberate strategy of refraining from filing a timely grievance so that the litigation 26 of the prisoner's claim can begin in federal court." Id. at 2384. The "benefits of exhaustion 27 can be realized only if the prison grievance system is given a fair opportunity to consider the 28 grievance." Woodford, 126 S. Ct. at 2388. Allowing any group of prisoners to deliberately

1  circumvent the PLRA's exhaustion remedies during their confinement, without the risk of
2  sanction, is inconsistent with Congress's express policies and "would turn that provision into
3  a largely useless appendage." See id. at 2387.  Nor do we believe that the express exhaustion
4  requirements of the PLRA define the universe of exhaustion.

5  Therefore, pursuant to general principles of administrative law, clearly expressed
6  congressional intent underlying the PLRA, and recent Supreme Court decisions broadly
7  construing the PLRA in order to protect the integrity of the federal exhaustion rule, we
8  conclude that plaintiff's complaints regarding the conditions of his confinement are subject
9  to the exhaustion requirement of not only § 1997e(a), but also general principles of
10 administrative law. Because he failed to exhaust his administrative remedies, his claims must
11 be dismissed.

12 Therefore, **IT IS ORDERED GRANTING** Pinal County Defendants' motion to
13 dismiss (doc. 35).

14 DATED this 1st day of May, 2008.

_Frederick J. Martone_
Frederick J. Martone
United States District Judge